In the Matter of the Application of OTTER TAIL POWER COMPANY for a certificate of Public Convenience and Necessity to Provide Electric Service to Dakota Tribal Industries, Inc., at Fort Totten, North Dakota.

BAKER ELECTRIC COOPERATIVE, INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION, Leo Reinbold, Dale Sandstrom, and Bruce Hagen as members of the North Dakota Public Service Commission, Respondents,

and

Otter Tail Power Company, Respondent.

Civ. No. 890131.

Supreme Court of North Dakota.

Jan. 25, 1990.

Ackre & Baer Chartered, Cando, for petitioner; argued by Larry M. Baer.

William W. Binek (argued), Asst. Atty. Gen., Public Service Commission, Bismarck, for respondent Public Service Commission.

R.W. Wheeler (appearance) of Wheeler Wolf, Bismarck, and Katherine E. Sasse-ville (argued), Gen. Counsel, Otter Tail Power Co., Fergus Falls, for respondent Otter Tail Power Co.

MESCHKE, Justice.

We exercise our supervisory power to determine whether the North Dakota Public Service Commission [PSC] has regulatory authority over electric utilities competing for a service point within an Indian reservation. Under the circumstances here, we conclude that the PSC had jurisdiction.

Dakota Tribal Industries, Inc. [DTI] is a corporation chartered and owned by the Devils Lake Sioux Tribe [Tribe]. DTI has a new manufacturing plant located wholly within the boundaries of the Fort Totten Indian Reservation. On April 12, 1988, the president of DTI applied to Baker Electric Cooperative, Inc. [Baker] for temporary and permanent electric service to its new manufacturing building. Baker, which serves customers on the reservation, accepted the application and extended temporary power for construction purposes.

On September 14, 1988, the Tribe formally adopted the following resolution:

> WHEREAS, The Devils Lake Sioux Tribe of Indians acting under a revised Constitution dated May 5, 1960, approved by the Acting Commissioner, Bureau of Indian Affairs, July 14, 1961, and as subsequently amended July 17, 1969, May 3, 1974, April 16, 1976 and May 4, 1981; and

> WHEREAS, the Devils Lake Sioux Tribal Council (hereinafter the Tribal Council), as the Governing Body of the Tribe, is empowered to regulate all business activities conducted upon the Devils Lake Sioux Indian Reservation; and

> WHEREAS, the regulation of franchise areas and which power company may provide service to a designated area within the confines of the exterior boundaries of the Devils Lake Sioux Indian Reservation is an exercise of tribal self-government and which exercise of is clearly recognized and supported by federal law; and

WHEREAS, the Tribal Council has deemed it necessary to exercise its regulatory authority as to service areas and/or franchise areas for electrical power companies or cooperatives which conduct business upon the Devils Lake Sioux Indian Reservation; and

NOW THEREFORE BE IT RESOLVED, that the Tribal Council hereby designates Otter Tail Power Company to provide electrical service to Dakota Tribal Industries.

Otter Tail Power Company [Otter Tail], which also serves customers on the reservation, received a copy of the resolution from the Tribal Council and filed a "Notice of Intent to Extend Service to Dakota Tribal Industries" with the PSC. In that document, Otter Tail took the position that the Tribal Council was "empowered to regulate all business activities conducted upon" the reservation, "which is a federal enclave and/or a sovereign jurisdiction for purposes of determining the civil rights of non-reservation persons doing business with persons on the reservation." Otter Tail requested that the PSC issue a certificate of public convenience and necessity authorizing Otter Tail to serve DTI "if the Commission should find that the actions taken by Otter Tail ... are in accord with the desire of the Devils Lake Sioux Tribe."

In response, the PSC notified Otter Tail that it had jurisdiction and that Otter Tail should formally apply for a certificate of public convenience and necessity. Otter Tail did so and Baker protested. The PSC held a hearing on the application which included the issue of the PSC's authority to act on the matter. At the hearing, a member of the Tribe testified about the authenticity of the tribal resolution and about the location of the service point within the reservation. However, neither the Tribe nor DTI appeared, nor have they participated in these proceedings in any manner.

Before the PSC acted, Baker discovered that Otter Tail had begun supplying electric service to DTI. Baker sought to have the PSC hold Otter Tail in contempt. On April 4, 1989, the PSC issued a show cause order and set a hearing for April 25, 1989.

Otter Tail responded by petitioning the district court for a writ of prohibition on April 10, 1989 on the grounds that the PSC lacked jurisdiction over electric service to points on the reservation. The district court granted the writ and scheduled a hearing for May 5, 1989. Baker then moved this court to quash the district court's writ of prohibition and, alternatively, for assumption of original jurisdiction. We treated the motion as an application for a supervisory writ; ordered that the writ of prohibition be suspended insofar as it prohibited the PSC from making findings and reaching a decision on the issues of jurisdiction and of public convenience and necessity; ordered that the PSC not be permitted to proceed against Otter Tail for contempt; and ordered that thereafter the jurisdictional issue be reviewed by this court. On May 15, 1989, the PSC decided, among other things, that it had jurisdiction to regulate electric service to the DTI building on the reservation. We limit our supervisory review to that jurisdictional decision.

## STANDING

■ Otter Tail asserted that assumption of jurisdiction by the PSC would unlawfully interfere with the Tribe's sovereign rights of self-government. However, because the Tribe (which did not appear) was the proper party to press the potential of harm to its governmental interests, we conclude that Otter Tail had no standing to advance the Tribe's self-government interests.

As an aspect of justiciability, the standing requirement focuses upon whether a litigant has alleged such a personal stake in the outcome of the controversy as to justify exercise of the court's remedial powers on the litigant's behalf. *State v. Carpenter*, 301 N.W.2d 106, 107 (N.D. 1980); *Trinity Medical Center v. N.D. Board of Nursing*, 399 N.W.2d 835, 838 (N.D.1987). A litigant must assert his own legal rights and interests, and cannot claim the legal rights and interests of third parties, unless " 'weighty countervailing policies' " exist. *Hovet v. Hebron Public School Dist.*, 419 N.W.2d 189, 193 (N.D.

1988) [quoting *State v. Woodworth*, 234 N.W.2d 243, 249 (N.D.1975) ]. The reasons for this limitation on standing are "the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978). Otter Tail's argument primarily advanced the Tribe's interests in self-government, the rights of a third party not present.

Otter Tail asserted that the Tribe's failure to appear is irrelevant to the jurisdictional question because in *Cotton Petroleum Corp. v. New Mexico*, — U.S. —, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), the Supreme Court considered the interests of the Jicarilla Apache Tribe although the tribe was not a party and participated only by way of amicus briefs. Although the *Cotton Petroleum Corp.* opinion did not say whether standing was questioned in the Supreme Court, we know that the issue was not raised in the state court proceedings. *See Cotton Petroleum v. State*, 106 N.M. 517, 745 P.2d 1170, 1172 n. 2 (Ct.App. 1987). We do not look upon *Cotton Petroleum Corp.* as helpful on standing.

In *Northern Border Pipeline Co. v. State*, 772 P.2d 829 (Mont.1989), a pipeline company attempted to assert that the state's property tax levied on the portion of its pipeline running beneath reservation trust lands impermissibly interfered with the Indian tribes' sovereign rights of self-government. The Montana Supreme Court concluded that although the pipeline company had standing by virtue of its taxpayer status to challenge the property tax imposed on it by the state, the company did "not have standing to assert the Tribes' sovereign right of self-government in doing so." *Northern Border Pipeline Co. v. State, supra*, 772 P.2d at 836. We agree with the rationale of the Montana Supreme Court. Otter Tail has not postulated suffi-

ciently "weighty countervailing policies" for us to depart from the general rule against third-party standing. *See Hovet v. Hebron Public School Dist., supra.* We conclude that Otter Tail could not assert the self-government interests of the Tribe to defeat the PSC's authority over Otter Tail's activities.

## PSC JURISDICTION

Even assuming that Otter Tail had standing to assert the self-government interests of the Tribe, we nevertheless conclude that the PSC had jurisdiction in this case.

Neither party cited, nor have we discovered, a court decision about state regulatory jurisdiction over electric service within an Indian reservation.[1] In *Application of Otter Tail Power Co.*, 354 N.W.2d 701 (N.D.1984), this court concluded that federal law did not foreclose the PSC from acting on a request for a certificate of public convenience and necessity to extend electric service to a Bureau of Indian Affairs school within the Turtle Mountain Indian Reservation. However, we did not there consider whether the PSC's exercise of jurisdiction infringed upon the tribal right of self-government. *Application of Otter Tail Power Co., supra*, 354 N.W.2d at 705–706. That decision does not control this case.

To begin our analysis, we highlight the general proposition that there is no "inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent. '[U]nder certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and ... in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members.' " *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214–215, 107 S.Ct. 1083, 1091, 94 L.Ed.2d 244 (1987) [quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331–332, 103 S.Ct. 2378, 2385, 76 L.Ed.2d

---

**1.** Otter Tail cited *Re Continental Divide Electric Cooperative, Inc.*, 43 P.U.R.3d 480, 483 (1962), in which the New Mexico Public Service Commission summarily concluded that it had no juris-

diction to issue a certificate of public convenience and necessity affecting a portion of an electric system within the Navajo Indian Reservation.

611 (1983)]. The question is whether the PSC had authority over activities by Otter Tail, a nonmember of the Tribe, on the reservation.

### I. *Brendale* Guidance

Our principal guidance for adjudicating this thorny jurisdictional question comes from *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation,* — U.S. ——, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), which was decided after the PSC decision in this case. It is the most recent decision of the United States Supreme Court on the convoluted question about the reach of state regulatory authority onto an Indian reservation.

In *Brendale* the Court considered whether the Yakima Indian Nation or the county of Yakima in Washington had the authority to zone lands owned in fee by nonmembers of the tribe located within the boundaries of the Yakima Reservation. The Court, through a hodgepodge of divergent opinions, held that the Yakima Indian Nation had the exclusive authority to zone fee land owned by nonmembers of the tribe within what was termed the "closed" portion of the reservation, an area consisting mainly of trust property where only a small percentage of the land was held in fee. The Court also held, however, that the tribe lacked the authority to zone the fee land of nonmembers located within what was termed the "open" portion of the reservation, an area where approximately one-half of the land was held in fee.

Justice White, joined by three other justices, began by examining "whether the Yakima Nation has the authority, derived either from its treaty with the United States or from its status as an independent sovereign, to zone the fee lands." *Brendale, supra,* 109 S.Ct. at 3003. Justice White rejected the argument that the treaty with the Yakimas, which provided that "the land retained by the Yakima Nation 'shall be set apart ... for the exclusive use and benefit' of the Tribe, and no 'white man, excepting those in the employment of the Indian Department, [shall] be permitted to reside upon the said reservation without permission of the tribe,'" was the source

for the tribe's authority over the fee lands. *Brendale, supra* [quoting 12 Stat. 951, 952]. To support his conclusion, Justice White relied on *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), in which the Court held that the Crow Tribe had no authority to regulate non-Indian hunting and fishing on fee land within the reservation. Justice White determined that, because of the tribe's subsequent alienation of land to nonmembers through sale and inheritance under the Indian General Allotment Act of 1887, 24 Stat. 388, any regulatory power the tribe might have under the treaty could not apply to lands held in fee by non-Indians. Justice White also found that the tribe derived no authority to zone the fee lands from its "inherent sovereignty" because inherent sovereignty "is divested to the extent it is inconsistent with the tribe's dependent status, that is, to the extent it involves a tribe's 'external relations.'" *Brendale, supra,* 109 S.Ct. at 3005 [quoting *United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978)]. Because express congressional delegation is required under these circumstances, and none was asserted, Justice White concluded that the tribe had no authority under the "general principle enunciated in *Montana*" for zoning any of the fee lands at issue. *Brendale, supra,* 109 S.Ct. at 3007.

Justice White then considered the *Montana* opinion's two exceptions to the general principle.

> First, '[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.' 450 U.S., at 565, 101 S.Ct., at 1257. Second, '[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.' *Id.* [450 U.S.] at 566, 101 S.Ct., at 1258.

*Brendale, supra.* The parties agreed that the first exception did not apply, and Justice White rejected the Tribe's argument that it had authority to zone under the second *Montana* exception. Justice White concluded that the tribe could not "complain or obtain relief against every use of fee land that has some adverse effect on the tribe. The impact must be demonstrably serious and must imperil the political integrity, economic security or the health and welfare of the tribe." *Brendale, supra,* 109 S.Ct. at 3008.

Justice White concluded that the county's zoning of the "open" area of the reservation imperiled no interests of the tribe and therefore the tribe had no authority to zone fee lands in that area. With regard to the "closed" area, Justice White would have remanded to the lower court to determine if county zoning in that area imperiled any protectable tribal interests. Justice White's opinion for the plurality gave wide sway to state regulatory authority, in the form of county zoning, on that reservation.

Justice Stevens, joined by one other justice, determined that the tribe's power to exclude nonmembers from its reservation derived not only from its treaty with the United States, but from its "aboriginal sovereignty." *Brendale, supra,* 109 S.Ct. at 3010. According to Justice Stevens, this power of exclusion "necessarily must include the lesser power to regulate land use in the interest of protecting the tribal community," and resolution of the case was dependent on "the extent to which the Tribe's virtually absolute power to exclude has been either diminished by federal statute or voluntarily surrendered by the Tribe itself." *Brendale, supra,* 109 S.Ct. at 3009. Justice Stevens concluded that, under the specific facts, the tribe had authority to zone fee lands in the "closed" area of the reservation, reasoning that:

> [N]otwithstanding the transfer of a small percentage of allotted land the Tribe retains its legitimate interest in the preservation of the character of the reservation. The Tribe's power to control the use of discrete, fee parcels of the land is simply incidental to its power to preserve the character of what remains almost

entirely a region reserved for the exclusive benefit of the Tribe.

*Brendale, supra,* 109 S.Ct. at 3014. Justice Stevens also determined, however, that because the tribe had alienated about one-half of the land in the "open" area and no longer had "the power to exclude nonmembers from a large portion of this area, it also lacks the power to define the essential character of the territory." *Brendale, supra,* 109 S.Ct. at 3015. Justice Stevens therefore concluded that the tribe had no authority to zone fee land in the "open" area. Where the Tribe's power to exclude had been diminished or surrendered, the state's regulatory power in the form of county zoning was sustained.

Justice Blackmun, joined by two other justices, interpreted the *Montana* decision as recognizing "the inherent authority of tribes to exercise civil jurisdiction over non-Indian activities on tribal reservations where those activities, as they do in the case of land use, implicate a significant tribal interest." *Brendale, supra,* 109 S.Ct. at 3018. Once the tribe's "valid regulatory interest is established," according to Justice Blackmun, "the nature of land ownership does not diminish the tribe's inherent power to regulate in the area." *Brendale, supra,* 109 S.Ct. at 3022. Justice Blackmun therefore concluded that the tribe had zoning authority "over all the lands within its reservation." *Brendale, supra,* 109 S.Ct. at 3026.

Justice Blackmun then addressed whether the county had concurrent zoning authority with the tribe over the areas in question. Justice Blackmun noted that a state can exercise concurrent jurisdiction over non-Indian activities on a reservation unless its authority is pre-empted by federal law or unless it infringes on the tribe's right to make their own laws and be ruled by them. *Brendale, supra,* 109 S.Ct. at 3026. Applying this test, Justice Blackmun stated that "[w]hen it is determined that the tribe, which is the one entity that has the power to zone trust lands, also has the power to zone fee lands, the inherent unworkability of concurrent zoning requires the conclusion that the tribe's power to

zone, once it chooses to exercise that power, is exclusive." *Brendale, supra,* 109 S.Ct. at 3027. Justice Blackmun therefore concluded that the county was without authority to zone the fee lands in both the "closed" and "open" areas of the reservation. State regulation of non-Indian activities, according to Justice Blackmun's minority view, must yield to the Tribe's inherent power to control and zone land use within the reservation, a "valid regulatory interest" of the tribe.

Although there was no majority consensus on the rationale to support the result reached in *Brendale,* the decision underscores the importance of particular facts in determining whether a state may regulate non-Indian activities within an Indian reservation.

## II. Analysis

In this case, the extent and nature of ownership of the land on the reservation was not fully developed on the record. The Fort Totten Indian Reservation has been described elsewhere:

> Fort Totten Reservation is adjacent to Devil's Lake, North Dakota. The reservation was created by treaty in 1867, and it is occupied by the Santee and Teton Sioux. The Devil's Lake Sioux Tribe claims title to 473 acres. Individual members have been allotted a total of 47,640 acres. The federal government owns approximately 1,800 acres. Non–Indians own 192,794 acres of the original reservation lands.

J. Trentadue, *Tribal Court Jurisdiction Over Collection Suits by Local Merchants and Lenders: An Obstacle to Credit for Reservation Indians?,* 13 Am.Indian L.Rev. 1, 13–14 (1987) [Footnotes omitted.][2] Applying the *Brendale* characterization, most of this reservation is "open" to non-Indian ownership and activities.

The DTI building is located in a relatively small industrial park development area of the reservation. It is not within the corporate limits of a municipality. Although it is not clear from the record, counsel have informed us that the DTI building is located either on property owned by the Tribe or on property held in trust by the United States for the benefit of the Tribe.

Both Baker and Otter Tail operate in the vicinity of the DTI building site. Otter Tail serves 48 customers within a two-mile radius of the DTI building and its electric distribution system was first built in 1927. Baker serves 468 customers within a two-mile radius of the building. Baker entered the area in 1951 and serves all areas which were not then served by Otter Tail. Baker serves all of the commercial, industrial, and residential customers immediately adjoining the DTI building. This is the first time the Tribe has attempted any regulation of electric utilities.

### A. *Treaty Powers*

■ Following *Montana* and Justice White's analysis in *Brendale,* we first look to the Tribe's treaty with the United States to determine whether the Tribe has the authority to regulate electric service to DTI. The 1867 treaty which established the Fort Totten Reservation contained no language similar to the "exclusive use and benefit" language found in the treaty in the *Brendale* case. This treaty provided that the bands of Dakota Sioux Indians "hereby cede to the United States the right to construct wagon roads, railroads, mail stations, telegraph lines, and such other public improvements as the interest of the government may require, over and across the lands claimed by said bands (including their reservation as hereinafter designated) over any route or routes that *that* (sic) may be selected by authority of the government, ...." Act of Feb. 19, 1867 [Act], art. II, 15 Stat. 505, 506. In consideration of this cession and "the faithful and important services ... rendered by the friendly bands," lands were "set apart for the members of said bands" as a "permanent reservation." Act, art. III, 15 Stat., *supra.* This treaty also authorized the "chiefs and headmen" of the reservation:

---

**2.** The figures in the article were compiled from *U.S. Dep't of Commerce, Federal and State Indi-* *an Reservations and Indian Trust Areas* 430 n. 50 (1974).

to adopt such rules, regulations, or. laws for the security of life and property, the advancement of civilization, and the agricultural prosperity of the members of said bands upon the respective reservations, and shall have authority, under the direction of the agent, and without expense to the government, to organize a force sufficient to carry out all such rules, regulations, or laws, and all rules and regulations for the government of said Indians, as may be prescribed by the Interior Department: *Provided*, That all rules, regulations, or laws adopted or amended by the chiefs and headmen on either reservation shall receive the sanction of the agent.

Act, art. X, 15 Stat. at 510.

Although the treaty granted the Tribe the authority to adopt rules and regulations for the general "security of life and property," we do not view the treaty as granting the Tribe the right to regulate electric services on the reservation. Rather, the regulation of electric service is analogous to the "public improvement" rights ceded to the government under Article II of the treaty. Although those rights were specifically ceded to the United States rather than state government, there has been some history of federal deference to state regulatory authority for local electric utility services. *See* 16 U.S.C. § 2627(b).[3] *See also Application of Otter Tail Power Co., supra*. We conclude that the Tribe's regulatory authority does not derive from its treaty with the United States.

### B. *Inherent Sovereignty*

We next consider whether the Tribe's power to regulate electric services derives from its inherent sovereignty. Under Justice White's rationale in *Brendale*, an Indian tribe's inherent sovereignty is generally divested as to all external relations with non-tribal members absent express congressional delegation. Justice Stevens' analysis in *Brendale* begins with the proposition that the tribe's inherent power to exclude nonmembers from the reservation includes the lesser power to regulate on the reservation and that any divestment of that power depends on whether it has been either diminished by federal statute or voluntarily surrendered by the tribe itself. Under either theory, we do not believe the Tribe has the authority through its inherent sovereignty to regulate electric services to DTI by electric utilities.

### 1. Congressional Delegation or Pre–Emption

■ Otter Tail asserted that, because DTI is located on "tribal/trust lands," and *Brendale* and *Montana* involved lands held in fee by nonmembers of the tribe, there is no basis to assert any divestment of tribal sovereignty in this case. Although the Supreme Court "readily agree[d]" in *Montana, supra*, 450 U.S. at 557, 101 S.Ct. at 1254, with the lower court's holding that the Indian tribe could "prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe," it is not clear from the opinion that this right derived from the tribe's inherent sovereignty. Rather, it appears more probable to us that the tribe's power over trust lands identified in *Montana* and *Brendale* derived from express congressional delegation, or more specifically, from express pre-emption of state authority by federal law.

The provisions of 28 U.S.C. § 1360(b) clearly deny states the authority, with regard to "any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States," to regulate "the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto...." The Secretary of the Interior has promulgated 25 C.F.R. § 1.4:

---

**3.** 16 U.S.C. § 2627(b), which is part of the Public Utility Regulatory Act of 1978, provides:
*State authority*
Nothing in this chapter prohibits any State regulatory authority or nonregulated electric utility from adopting, pursuant to State law, any standard or rule affecting electric utilities which is different from any standard established by this subchapter.

*State and local regulation of the use of Indian property.*

(a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.[4]

The zoning of trust lands in *Brendale,* as well as the hunting and fishing regulations on trust lands in *Montana,* clearly fall within the purview of this regulation prohibiting the applicability of state laws with regard to "the use or development" of Indian property.

We are not convinced, however, that a state law allocating electric services between competing utilities constitutes a law governing, regulating, or controlling "the use or development" of trust property. The Tribe has determined that the property is to be developed as part of its industrial park and that it will be used for manufacturing purposes by DTI. State regulation of the electric suppliers to the property does not preclude the Tribe's use or development of this property. We hold that the PSC's regulation of electric services does not fall within the meaning of a state land use or development regulation prohibited by 25 C.F.R. § 1.4. We therefore conclude, as we did in *Application of Otter Tail Power Co., supra,* that state regulation is not expressly pre-empted by federal law,

and, more specifically, that there is no express congressional grant of authority for the Tribe to regulate in this manner.

2. Voluntary Relinquishment

■ Under Justice Stevens' rationale, any inherent regulatory power the Tribe may have to regulate non-Indian activities on the reservation may be voluntarily surrendered by the Tribe itself. The PSC found that:

The Devils Lake Sioux Tribe has established no comprehensive system for the regulation of electric utilities on the reservation, and this is the only instance where the Tribe has attempted any type of electric utility regulation. There is no tribal regulation of rates, service and safety standards or service territory generally. The tribe does not employ engineers, accountants and other professionals or technicians to regulate utilities.

The Tribe has traditionally accommodated, if not acquiesced in, the State's exclusive and long-standing regulation of electric power suppliers.

Tribal accommodation to traditional state regulation is a significant consideration. *See Montana, supra,* 450 U.S. at 564 n. 13 and 566, 101 S.Ct. at 1258 n. 13 and 1259; *Burlington Northern Railroad Co. v. Dept. of Public Service Regulation,* 221 Mont. 497, 720 P.2d 267, 269 (1986). The Tribe's failure to assert jurisdiction over electric utility investment in the past has permitted, if not induced, substantial investments within the reservation which will probably not be recovered if services are duplicated. Furthermore, in view of the large land holdings by nonmembers of the Tribe within the reservation when compared with the reduced amount of trust and tribal-owned lands, it is doubtful that the Tribe retains, in Justice Stevens' words,

---

**4.** Subsection (b) of 25 C.F.R. § 1.4 provides: The Secretary of the Interior or his authorized representative may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any party of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) of this section as he shall determine to be in the best interest of the Indian owner or owners in achieving the highest and best use of

such property. In determining whether, or to what extent, such laws, ordinances, codes, resolutions, rules or other regulations shall be adopted or made applicable, the Secretary or his authorized representative may consult with the Indian owner or owners and may consider the use of, and restrictions or limitations on the use of, other property in the vicinity, and such other factors as he shall deem appropriate.

"the power to define the essential character of the territory." *Brendale, supra,* 109 S.Ct. at 3015. We conclude that, under the circumstances, the Tribe does not derive power from its inherent sovereignty to regulate the choice of electric suppliers to the DTI area.

### C. *Montana Exceptions*

We next consider whether the Tribe's authority derives from either of the two "exceptions" to the general principle mentioned in *Montana* and again in Justice White's opinion in *Brendale.*

### 1. Consensual Relationship

■ The first *Montana* exception is that "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana, supra,* 450 U.S. at 565, 101 S.Ct. at 1257. Otter Tail asserted that the Tribe derived authority under this exception because "the tribe is regulating the terms of non-member Otter Tail's commercial dealings with a tribal corporation, or 'member.'"

Viewing the relationship between a supplier and consumer of electricity as merely a "consensual relationship" undifferentiated from other types of commercial transactions ignores the nature of the electric utility business. The "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983); *see also Montana–Dakota Utilities Co. v. Johanneson,* 153 N.W.2d 414, 420 (N.D.1967). In the exercise of its police power, the Legislature has given the PSC broad authority to regulate "[e]lectric utilities engaged in the generation and distribution of light, heat, or power." NDCC 49–02–01(4).

The authority of the PSC over electric utilities is extensive. The regulatory powers of the PSC include the authority to "supervise the rates of all public utilities" [NDCC 49–02–03], except those owned or operated by the state or its political subdi-

visions, or any public utility not operated for profit. NDCC 49–02–01.1. The PSC may take action against an electric utility for unreasonable or discriminatory rates, rules, or practices [NDCC 49–02–17 and 49–02–18], and for unsafe or inadequate services. NDCC 49–02–04. The PSC may also regulate "the raising and lowering of electric supply ... lines...." NDCC 49–02–21. The PSC may regulate issuance of certain stocks, bonds, notes, and other evidences of indebtedness by an electric public utility. NDCC 49–04–04. The PSC is also given authority to regulate the construction, operation and maintenance of electric supply lines and of conversion and transmission facilities in the state. NDCC 49–20–02 and 49–22–07.

Prominent among the powers granted to the PSC is its authority to control an electric public utility's construction and extension of its plant or system pursuant to NDCC Chapter 49–03, and more specifically, NDCC 49–03–01.1, 49–03–01.3, 49–03–01.4 and 49–03–01.5, known as the Territorial Integrity Act, through issuance of certificates of public convenience and necessity. The primary purpose of the Territorial Integrity Act was "to keep to a minimum wasteful duplication of capital-intensive utility services and conflicts between suppliers of electricity." *Cass County Elec. Co-op. v. N.S.P.,* 419 N.W.2d 181, 185 (N.D. 1988). Although customer preference is a factor to be considered in deciding whether public convenience and necessity requires the extension of a utility system in a rural area, it is a "minor consideration" which "cannot prevail where economic factors, such as relative costs and wasteful duplication, provide other criteria for choice." *Tri–County Electric Cooperative, Inc. v. Elkin,* 224 N.W.2d 785, 792 (N.D.1974). Construction of a supply line affects the entire system of an electric utility.

Two additional observations can be made. First, an electric supply system, over which the PSC has regulatory control, is generally not confined to particular parcels of property, but spans across reservation boundaries as well as state borders. Otter Tail does not argue that none of its electric

distribution system existing outside reservation boundaries is used to implement the service within the reservation. Second, the Territorial Integrity Act implicitly gives preference to the interests of the public in general over the preference of a particular electric customer to have a certain supplier furnish it with electricity. Because " '[a]n individual has no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself,'" [*Matter of Certain Territorial Elec. Boundaries, Etc.*, 281 N.W.2d 65, 72 (S.D.1979), quoting *Storey v. Mayo*, 217 So.2d 304, 307–308 (Fla.1968) ], it is inaccurate to view a request for service by a potential electric customer from an electric supplier as forming a "consensual relationship" similar to that which occurs in other commercial contexts.

In *Williams v. Lee* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), one of the cases relied upon in *Montana* for the "consensual relationship" exception, the Court held that an on-reservation non-Indian merchant must sue in tribal court to recover payment for goods sold on credit to a reservation Indian. As one court has opined: "There is a basis for treating the merchant [in *Williams v. Lee* ] as having implicitly consented to be a plaintiff in tribal court: he knew he was dealing with an Indian, and he could limit his credit sales and thus control the size of the claim he would have to take to the tribe for resolution." *UNC Resources, Inc. v. Benally*, 514 F.Supp. 358, 363 (D.N.M.1981). Implicit consent does not exist in this case. Otter Tail purchased part of its reservation electric distribution system in 1968 from the Fort Totten Agency. The Bureau of Indian Affairs–Otter Tail purchase contract, which was ratified by the Committee on Interior and Insular Affairs of the Senate and House of Representatives, provided in part that:

Otter Tail will provide electric service to customers requesting same subsequent to the effective date of this contract in accordance with Otter Tail's rules and regulations and *in conformance with the rules and regulations of the Public Service Commission of the State of North Dakota.* [Emphasis added.]

The contract further provided that:

The rates charged by Otter Tail to agencies of the United States and *to others* will be those rates currently in effect as *approved by the Public Service Commission, including applicable rules and regulations as approved by the Public Service Commission, and subject to the applicable rules and regulations established by the Public Service Commission.* [Emphasis added.]

Otter Tail's electric system is not confined to the reservation. Rather, the electricity is generated outside of reservation boundaries and is delivered to points on the reservation through a system largely outside the reservation. We view the present case as the Tribe reaching outside the reservation to regulate a public utility, rather than as a "reaching in" by a non-Indian business entity. *Cf. Smith Plumbing Co. v. Aetna Casualty & Surety*, 149 Ariz. 524, 720 P.2d 499, 506 (1986). We conclude that the *Montana* "consensual relationship" exception is not applicable under the circumstances of this case.

### 2. Threat to Political Integrity

The second *Montana* exception is that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana, supra,* 450 U.S. at 566, 101 S.Ct. at 1258. The Tribe has the burden of proof on this issue. *See Brendale, supra,* 109 S.Ct. at 3008; *Montana, supra.*

As we have already noted, the Tribe made no appearance in these proceedings to explain how its political integrity, economic security, or health and welfare would be threatened by the PSC's exercise of jurisdiction. The PSC found that the Tribe has never attempted any type of electric utility regulation in the past. The PSC has traditionally exercised jurisdiction over electric suppliers on the reservation. These circumstances negate the claim that

the Tribe's resolution directing that Otter Tail serve DTI was necessary to tribal self-government. *See Montana, supra,* 450 U.S. at 564 n. 13, 101 S.Ct. at 1258 n. 13. We reject Otter Tail's argument that regulation of an electric service is a "quintessential act" of the Tribe's right of self-government.

Otter Tail also asserted that the Tribe's economic security is jeopardized because DTI's competitive position in the marketplace will be undercut by being forced to pay Baker's higher electric rates. However, the difference in electric costs to DTI was not fully developed in this record because the rate structure for permanent electric service to DTI had not yet been established by Baker. As Justice White pointed out for the plurality in *Brendale,* the Tribe's interest under federal law, defined in terms of the impact of the challenged regulations on the political integrity, economic security, or the health or welfare of the tribe, does not entitle the Tribe to preclude everything that has an adverse effect on the Tribe. Rather, the impact must be "demonstrably serious." *Brendale, supra,* 109 S.Ct. at 3008. Otter Tail's theoretical arguments fall short of demonstrating any serious effect on the Tribe's economic security.

We conclude that the Tribe does not derive the power to regulate an electric service on the reservation under either of the *Montana* exceptions.

**D. *Concurrent Jurisdiction***

■ Assuming for the sake of argument that the Tribe had the power to regulate the electric service in this case, another question follows: Can the PSC exercise concurrent jurisdiction? *See Brendale, supra,* 109 S.Ct. at 3026 (Blackmun, J.).[5] Justice Blackmun observed in *Brendale, supra:*

> Suffice it to say that our cases recognize that the States have authority to exercise jurisdiction over non-Indian activities on the reservation, see, *e.g., New Mexico v. Mescalero Apache Tribe, supra,* but that this authority is pre-empted if it either 'unlawfully infringe[s] "on the right of reservation Indians to make their own laws and be ruled by them"' *White Mountain Apache [Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 2582, 65 L.Ed.2d 665 (1980)], quoting *Williams v. Lee,* 358 U.S., at 220, 79 S.Ct., at 270, or 'interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.' *Mescalero Apache,* 462 U.S., at 334, 103 S.Ct., at 2386.

**1. Implied Pre–Emption**

Because we have already concluded that the PSC's regulatory authority in this case has not been expressly pre-empted by federal law, we turn to whether it has been impliedly pre-empted. The Supreme Court has "applied a flexible pre-emption analysis

**5.** Although Justice Blackmun concluded in *Brendale, supra,* 109 S.Ct. at 3027, that the State had no concurrent zoning authority once the Tribe asserted its zoning authority, Justice Stevens looked more favorably at the possibility that the county might possess concurrent zoning authority over the "closed" area:

> Because the county did not appeal, we are not presented with the question whether the county might possess concurrent zoning jurisdiction over the closed area. The possibility that the county might have jurisdiction to prohibit certain land uses in the closed area does not suggest that the Tribe lacks similar authority. This sort of concurrent jurisdiction, if it does exist, is simply a product of the unique overlapping of governmental authority that characterizes much of our Indian-law jurisprudence. *See, e.g., Cotton Petroleum Corp. v.*

*New Mexico,* 490 U.S. [——], 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989). Moreover, overlapping land use regulations are not inherently suspect. The developer of land in the vicinity of an airport, for example, must comply with local zoning laws and federal limitations on the height of buildings that may obstruct air travel. Likewise, federal and state environmental protection requirements may be superimposed on county or tribal zoning ordinances. Although the potential for conflict between a county's rules and a tribe's rules is certainly substantial, it is neither inevitable nor incapable of resolution by a tolerant and cooperative approach to the problems that are generated by the continuing growth and complexity of our diverse society.
> *Brendale, supra,* 109 S.Ct. at 3013 n. 3.

sensitive to the particular facts and legislation involved. Each case 'requires a particularized examination of the relevant state, federal, and tribal interests.'" *Cotton Petroleum Corp. v. New Mexico*, —— U.S. ——, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989) [quoting *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982)]. We examine those interests relevant here.

The state's interest, described earlier, in regulating suppliers of electricity in furtherance of the public good is substantial and ranks among "the most important functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. v. Arkansas Public Service Comm'n, supra.* Because electric service is capital-intensive, state regulation designed to avoid wasteful duplication of facilities between competing electric suppliers benefits all consumers of electricity. "A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336, 103 S.Ct. 2378, 2388, 76 L.Ed.2d 611 (1983). The electric supply systems of Otter Tail and Baker are not confined to the reservation but extend throughout a large portion of the state. Thus, the economic impact of operations within the reservation can adversely affect non-reservation customers of those electric suppliers.

Otter Tail has not referred us to any federal legislation which suggests a federal policy encouraging electric utility regulation by Indian tribes. The Tribe's interest is difficult to identify. Indeed, electric utility regulation by the Tribe can hardly be characterized as "an important area of 'traditional tribal control.'" *Byzewski v. Byzewski*, 429 N.W.2d 394, 399 (N.D.1988) [quoting *Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877, 889, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986)]. *See also McKenzie County Social Services Bd. v. V.G.*, 392 N.W.2d 399, 402 (N.D.1986). The Tribe has acquiesced in the state's regulation of electric utilities on the reservation in the past. We conclude that the state's authority over electric suppliers has not been impliedly pre-empted by federal law.

### 2. Infringement of Tribal Self–Government

Infringement of the Tribe's right to make its own laws and be ruled by them is difficult to comprehend because, as the PSC found, the Tribe has not developed a regimen for regulating electric suppliers. Even assuming that the tribal resolution, which, after the fact and unilaterally, directed Otter Tail to be the supplier of electricity to DTI, was a valid governmental exercise, "minimal" burdens on tribal self-government are allowable. *See Washington v. Confederated Tribes*, 447 U.S. 134, 151, 100 S.Ct. 2069, 2080, 65 L.Ed.2d 10 (1980); *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 483, 96 S.Ct. 1634, 1646, 48 L.Ed.2d 96 (1975). Otter Tail has failed to show anything more than a minimal burden on tribal self-government by the PSC's exercise of regulatory jurisdiction on the reservation. Because there is no tradition of sovereignty by the Tribe over electric service, and because there is a potential economic impact on consumers beyond reservation boundaries, "we may accord little if any weight to any asserted interest in tribal sovereignty in this case." *Rice v. Rehner*, 463 U.S. 713, 725, 103 S.Ct. 3291, 3299, 77 L.Ed.2d 961 (1983). In this case, we conclude that the State's interest in regulating a public utility outweighs the minimal burden on tribal self-government.

In accordance with this opinion, we grant the supervisory writ. We order that the district court's writ of prohibition be vacated and that the PSC be permitted to proceed with the contempt proceedings against Otter Tail. Subject to the normal review procedures, the PSC may now implement its decision on the merits of the public convenience and necessity.

ERICKSTAD, C.J., and GIERKE and VANDE WALLE, JJ., concur.

LEVINE, Justice, concurring in result.

I join only in that portion of the majority opinion that holds that Otter Tail Power

Company has no standing to assert the jurisdictional question. As to the rest of the opinion, I observe that although the majority has ranged far and wide in answering broad questions about the authority of the Tribe to regulate electric service to the Reservation, the regulatory issue that would be before us if the Tribe were, is a much narrower one than the majority opinion recognizes. The question to be answered would be only: May the Tribe regulate a non-member utility which furnishes electrical power to a business within the Reservation belonging to the Tribe and located on land owned by the Tribe? Under *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), I believe the answer is "yes."

In *Montana*, the Supreme Court agreed with the Court of Appeals that the Tribe could regulate hunting or fishing by non-members on land belonging to the Tribe or held by the United States in trust for the Tribe. That parallels the situation here where the land involved belongs to tribe members. Nor was there any question raised in the *Brendale* case [*Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, — U.S. ——, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989)], that the Tribe had exclusive jurisdiction to zone land owned by members of the Tribe and located within the Reservation.

I note also that neither side to this dispute offered arguments based on state law. *See, e.g.*, ch. 54–40.2, NDCC.

I am uneasy and concerned that in deciding so many issues, we have jumped the gun without the benefit of the input of the Tribe and its presentation of the tribal interests at stake. Even if the majority's conclusion that the Tribe has no inherent sovereign authority to regulate Otter Tail in this case is correct, it is impetuous to decide, as the majority does, that PSC regulation does not threaten or have some direct effect on the political integrity, the economic security, or the health or welfare of the Tribe. We should wait to hear from the Tribe before we denigrate its interests. Indeed, in *Brendale*, the trial court made specific findings that the county's exercise of zoning power would have no direct effect on the tribe and would not threaten the tribe's political integrity, economic security or health and welfare. Here, the PSC made no comparable findings. Nor could it have, without any evidence on these critical issues of fact from the Tribe or from anyone else.