Myer SHARK and K.W. Simons, Appellants,

v.

U.S. WEST COMMUNICATIONS, INC., BEK Communications Cooperative, Consolidated Telephone Cooperative, Dakota Central Telecommunications Cooperative, Dickey Rural Telephone Cooperative, Griggs County Telephone Company, Inter–Community Telephone Company, Moore & Liberty Telephone Company, Midstate Telephone Company Northwest Communications Corporation, North Dakota Telephone Company, Polar Communications Mutual Aid Corporation, Red River Rural Telephone Association, Reservation Telephone Cooperative, United Telephone Mutual Aid Corporation, West River Telecommunications Cooperative, and their affiliates, Appellees

and

The Public Service Commission of North Dakota, Respondent.

Civil No. 950407.

Supreme Court of North Dakota.

March 21, 1996.

Myer Shark Law Office, Fargo, for appellants; argued by Myer Shark. Peterson Law Office, Fargo; appearance by Craig A. Peterson.

Zuger, Kirmis & Smith, Bismarck, for appellee U.S. West; argued by Daniel S. Kuntz. William P. Heaston (appeared), Senior Attorney, U.S. West Communications, Inc., Denver.

The Law Office, Ltd., Grafton, for appellee Independent Telephone Company Group; argued by Wallace R. Goulet.

MESCHKE, Justice.

Myer Shark and K.W. Simons appeal from a district court order dismissing their separate appeals from the North Dakota Public Service Commission's (PSC) approval of the sale and transfer of sixty-eight telephone exchanges by U.S. West Communications, Inc. (West) to fifteen cooperative and independent telephone companies. The court held Shark and Simons lacked standing for judicial review. We affirm the dismissals.

West and the Independent Telephone Company Group (ITCG) petitioned the PSC in November 1994 to approve West's sale of some of its local telephone exchanges in North Dakota, and to approve the transfer of each associated certificate of public convenience and necessity for each buyer or its affiliate to own and operate the acquired exchange. *See* NDCC ch. 49–03.1 & ch. 49–21. The five independent telephone companies and the ten rural telephone cooperatives in the ITCG agreed to purchase exchanges with 48,000 telephone customers in 68 communities.

The PSC held informal "public input" hearings between January 30 and February 14, 1995, in each of ten communities for telephone customers to discuss the proposed transfers. On March 8, the PSC published a notice of hearing that set a deadline of April 3, 1995, for interested persons to intervene, and scheduled a formal "technical hearing" for June 5, 1995. On March 20, 1995, the PSC amended the notice to reschedule the hearing to begin on May 1, 1995.

Myer Shark, a business and residential customer of West's Fargo telephone exchange (one not being sold), petitioned to intervene. On March 22, 1995, the PSC found "Shark does have an interest in this matter and his participation will not unduly broaden the issues or delay the proceeding," warned his "[a]dmission as an intervenor

shall not be construed as recognition by the [PSC] that [he] might be aggrieved by an order ... in this case," and thus conditionally granted him intervention.

Though he did not petition to intervene, K.W. Simons, a customer of West's telephone exchange at Rolla, one being sold to an affiliate of United Telephone Mutual Aid Corporation, an ITCG member, wrote a letter to one PSC commissioner on April 17, 1995. The letter praised that commissioner's position and complained about the apparent position of the other two commissioners in scheduling the case.

After the "technical hearing" on May 1–3, 1995, post-hearing briefs, and other procedures, the PSC entered its findings, conclusions, and order on May 17, 1995. The order approved the sale of the exchanges and the transfers of the associated certificates of public convenience and necessity upon certain conditions that were agreeable to West and to the ITCG.

In June 1995, Shark appealed the order in Steele County, and Simons appealed it in Rolette County. Those two appeals and another were consolidated by agreement in Steele County. West and ITCG moved to dismiss the three appeals for lack of standing.

After the third appeal was settled, the district court ruled on November 15, 1995, that Shark "is not factually aggrieved" because the "challenged Order has not caused [him] injury in fact, economic or otherwise," that "Simons did not participate in the agency proceeding," and that, since both thereby lacked standing, "it is not necessary for the Court to consider the merits of their arguments on appeal." The court dismissed their appeals.

Shark and Simons each appealed to this court. Shark contends he has standing to challenge the application and constitutionality of legislation that became effective on April 18, 1995, which he claims "retroactively" diminished the scope of the hearing to his disadvantage. *See* 1995 N.D. Laws ch. 30, §§ 4, 5, & 8 (emergency measure amending NDCC 49–03.1–04 & 49–21–01.2). He principally argues that the new legislation was wrongly applied to revoke PSC power to consider whether "rates to be charged by [West] in the[ ] exchanges not being sold" were reasonable, and whether West should "be required to share profits from the sale with customers or be required to reinvest profits from the sale in its existing North Dakota service territory." Even if those facets of the proceeding were properly eliminated by the new legislation, Shark contends, with scant references, that "the District Court leaped over almost universally recognized case law and authoritative treatises" that support his standing as a customer of the seller to contest the proposed sale. He urges that any "West ... customer ... has a vital interest" for standing to contest the proposed transfer of part of West's property.

Simons contends that, although he did not intervene or actually participate in the "technical hearing," his prehearing letter to a PSC commissioner was sufficient participation for standing to appeal. He urges that "a liberal interpretation of the term 'participation' with a view to encouraging consumer review of agency decisions is necessary." His position on the merits of the appeal parallels Shark's.

"Any party to any proceeding heard by an administrative agency ... may appeal from the order...." NDCC 28–32–15(1). Under NDCC 28–32–14(1), only a party "who is aggrieved by the final order of the agency ... may file a petition for reconsideration with the agency." But the limits of judicial power to review agency and executive action are marked by several doctrinal boundaries, including the concept of standing.

"Standing" is necessary for judicial review through appeal of an administrative order, this court held in *Application of Bank of Rhame*, 231 N.W.2d 801 (N.D.1975). In that case, the Bank of Rhame challenged an appeal by First National Bank of Bowman, a competitor, from an order of the North Dakota Banking Board that allowed the Bank of Rhame to move to Bowman. This court had to decide "who are parties for purposes of seeking [judicial] review" of an administrative decision. *Id.* at 806.

Because the Administrative Agencies Practice Act, NDCC ch. 28–32, did not define

"party" for any purpose, this court surveyed the subject and reasoned:

> The question of who is a proper party should not be resolved on strict technical grounds which could result in the public being denied the opportunity to question the actions of the governing agency, body or board.... Any doubt on the question of standing involving a decision by an administrative body should be resolved in favor of permitting the exercise of the right of appeal by any person aggrieved in fact.

*Bank of Rhame*, 231 N.W.2d at 808 (footnote omitted). The court decided:

> [A]ny person who is directly interested in the proceedings before an administrative agency who may be factually aggrieved by the decision of the agency, and who participates in the proceeding before such agency, is a "party" to any proceedings for the purposes of taking an appeal from the decision.

*Id.* The court concluded that First National Bank of Bowman had standing to appeal because it had a direct interest as a competitor in the same community, participated in the agency proceeding, and was "factually aggrieved." *Id.*

Since the decision in *Bank of Rhame*, the legislature defined "party" to an agency proceeding in NDCC 28-32-01(8) to mean "each person named or admitted as a party or properly seeking and entitled as of right to be admitted as a party." 1977 N.D. Laws ch. 284, § 1. *Compare* Model State Administrative Procedure Act, 1961 Act § 1(5), 15 U.L.A. 137, 148 (1990) (substantially identical wording).[1] While this definition helped identify a party for purposes of the agency proceeding, it added nothing to the distinct concept of standing for judicial review of an agency decision. The legislative history for this amendment does not imply an intention to overrule or replace the standing doctrine of *Bank of Rhame*, or to expand the right to judicial review to merely nominal parties who are not aggrieved.

▆▆▆ In the context of an appeal for judicial review of an agency decision, standing is an aspect of the basic constitutional concept that confines the exercise of judicial power to actual cases and controversies. *See* 2 Am. Jur.2d *Administrative Law* § 438 (1994); III Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 16.2 (1994); 5 Jacob A. Stein, Glenn A. Mitchell, Basil J. Mezines & Joan D. Mezines, *Administrative Law* § 50.01 (1995). "[T]he question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151–52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (quoting *Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)). 64 Am. Jur.2d *Public Utilities*, § 287 (1972) ("Persons entitled to review"), focuses the concept for regulation of public utilities: "Within the

---

1. North Dakota's Administrative Agencies Practice Act was a pioneer effort based on an early draft of the 1946 Model Act:

> Even before the National Conference of Commissioners approved its 1946 Model Act, state administrative Procedure acts began to appear. North Dakota was the first in the field. That state enacted a law in 1941 based on an incomplete and early tentative draft of the 1946 Model Act. It set out basic procedures for state agency rule making and adjudication.

Model State Procedure Act, 1981 Act, Prefatory Note, 15 U.L.A. 1, 3 (1990) (footnote omitted). The Model Acts are one dimension of the legislative history of the North Dakota Administrative Agencies Practice Act.

A conceptual difference between a party to the agency proceeding and a "factually aggrieved" party entitled to obtain judicial review has developed. *See* Model State Administrative Procedure Act, 1981 Act § 1–102(6)–(7) & 5–106, 15 U.L.A. 1, 11, 114 (1990). The Comment to § 1–102 explains:

> The last clause, "properly seeking and entitled ...," was intended to confer upon would-be intervenors the right to seek judicial review if their petitions for intervention were denied. This act omits the clause, "properly seeking and entitled," for a number of reasons. First, the present draft contains one definition of "party" in connection with agency proceedings, in paragraph (6), and another definition of "party" in connection with judicial review or civil enforcement proceedings, in paragraph (7). Accordingly, the definition of "party to agency proceedings" in paragraph (6) is not intended to address the question whether a person is entitled to judicial review.

*Id.*, 15 U.L.A. at 13.

meaning of a statute authorizing a 'party aggrieved' by the order of public service commissioners to appeal to the courts, one is 'aggrieved' when his rights are injuriously affected by the unauthorized or irregular acts of the commissioners."

The over-arching concept of standing for justiciability has been explained by this court:

> The question of standing focuses upon whether the litigant is entitled to have the court decide the merits of the dispute. It is founded in concern about the proper— and properly limited—role of the courts in a democratic society. Without the limitation of the standing requirements, the courts would be called upon to decide purely abstract questions. As an aspect of justiciability, the standing requirement focuses upon whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to justify exercise of the court's remedial powers on his behalf. The inquiry is two-fold. First, the plaintiff must have suffered some threatened or actual injury resulting from the putatively illegal action. Secondly, the asserted harm must not be a generalized grievance shared by all or a large class of citizens; the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties.

*State v. Carpenter*, 301 N.W.2d 106, 107 (N.D.1980) (citations omitted); *see also Application of Otter Tail Power Co.*, 451 N.W.2d 95, 98 (N.D.1990) (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978)) ("The reasons for this limitation on standing are 'the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them.' ").

■ Decisions by this court since *Bank of Rhame* have continued to employ its three-part analysis for who has standing to obtain judicial review of an agency decision: One who is factually aggrieved, directly interested, and participates. *See Bank of Hamilton v. State Banking Bd.*, 236 N.W.2d 921 (N.D. 1975); *Citizens State Bank of Neche v. Bank of Hamilton*, 238 N.W.2d 655 (N.D.1976); *Reliance Ins. Co. v. Public Serv. Comm'n*, 250 N.W.2d 918 (N.D.1977); *Associated Gen. Contractors v. Local No. 580*, 278 N.W.2d 393, 397 (N.D.1979) (party with only "a nominal, formal, or technical interest in the action" lacks standing); *O'Connor v. Northern States Power Co.*, 308 N.W.2d 365, 371 (N.D. 1981) (ratepayers who did not participate in agency proceeding on rates of electric service could not challenge PSC order granting increase); *Matter of Persons*, 311 N.W.2d 919 (N.D.1981); *Bernhardt v. Rummel*, 319 N.W.2d 159 (N.D.1982) (party may be interested but not factually aggrieved if not injured in some manner); *Washburn Pub. Sch. Dist. No. 4 v. State Bd. of Pub. Sch. Educ.*, 338 N.W.2d 664, 668 (N.D.1983) (party who participated in agency proceeding but "neither gained nor lost anything" not factually aggrieved for standing to appeal agency decision); *Cass County Elec. Coop., Inc. v. Northern States Power Co.*, 518 N.W.2d 216 (N.D.1994) (competing enterprise has standing). For standing to obtain judicial review of this agency order, Shark and Simons each must be directly interested, be factually aggrieved, and have participated in the agency proceeding.

■ Simons did not participate. As a customer of an exchange approved for transfer, he would have been directly interested and factually affected by the change in ownership and operation of his telephone service. But his pre-hearing letter to a single commissioner does not represent significant participation in the agency proceeding.[2]

---

**2.** Generally, a party to a contested agency proceeding may not, *ex parte*, "communicate directly or indirectly in connection with any issue in that proceeding, while the proceeding is pending, with any agency head or hearing officer in the proceeding without notice and opportunity for all parties to participate in the communication."

NDCC 28–32–12.1(3). Of course, this does not prohibit "a member of the general public, not acting on behalf or at the request of any party, from communicating with an agency in cases of general interest." NDCC 28–32–12.1(8). Simons's letter was not improper; it was only an

■ Failure to raise a particular issue in the agency proceeding generally prevents judicial review of the issue on appeal. *See, e.g., Bieber v. North Dakota Dep't of Transp.*, 509 N.W.2d 64, 68 (N.D.1993). Specifically, *O'Connor v. Northern States Power Co.*, 308 N.W.2d at 371, held that an electric ratepayer who did not participate in the proceeding at the PSC could not contest the resulting rate increase in the courts. As a telephone customer, Simons is in the same position. Since he presented no position to the PSC about the transfers, Simons did not participate and lacks standing to obtain judicial review of the PSC's order approving the transfers.

Shark intervened and participated in the "technical hearing," and he argues that he will be "factually aggrieved" for standing to appeal. In granting Shark's petition to intervene, the PSC appropriately determined, for that early stage of the proceedings, that Shark did "have an interest in this matter," and that "his participation will not unduly broaden the issues or delay the proceeding," but the PSC did so conditionally.[3] The PSC ruled that his intervention should "not be construed as recognition by the [PSC] that [he] might be aggrieved by an order ... in this case." The district court concluded that the PSC order approving transfer of the telephone exchanges had not caused Shark

"injury in fact, economic or otherwise" so that he was not "factually aggrieved."

When an appellant was not aggrieved in fact, even though it was interested and had participated in the agency proceeding, the appeal was dismissed in *Washburn Pub. Sch. Dist. No. 4 v. State Bd. of Pub. Sch. Educ.*, 338 N.W.2d 664. The Washburn District participated in the State Board's hearing on the petition of parents in a neighboring district to annex their land to the Washburn District. When the State Board denied the annexation, the Washburn District appealed. The district court granted the State Board's motion to dismiss the appeal because the Washburn District was not an aggrieved party entitled to judicial review. This court affirmed, concluding that the Washburn District was not aggrieved in fact because it "neither gained nor lost anything." *Id.* at 668. The possibility of expanding the size of its district was not a direct effect that qualified the Washburn District to obtain judicial review of the State Board's decision.

■ To obtain judicial review, Shark concedes he needs to show that he may be factually aggrieved, but he does not demonstrate how he will suffer economic injury or physical interference with his telephone service from this sale and transfer.[4] Shark also does not plausibly explain how he would be affected by the repeal of former subsection 5 of NDCC 49–03.1–04 on "Proposed rates" as

---

expression of general interest, not an act of participation.

**3.** In 1991, when the legislature authorized "intervention" in an agency proceeding, it directed that the "agency may impose conditions and limitations upon intervention." 1991 N.D. Laws ch. 342, § 11 (codified at NDCC 28–32–08.2).

A petitioner for intervention must "demonstrate[ ]" his "legal rights ... or other legal interests may be substantially affected by the proceeding or that the petitioner qualifies as an intervenor under any provision of statute or rule." NDCC 28–32–08.2. According to testimony by Allen C. Hoberg, Assistant Attorney General and Director of the Administrative Hearings Officer Division, to the House Judiciary Committee on January 14, 1991, the bill that became ch. 342 of the 1991 S.L. and that enacted the section allowing intervention, "too draws substantially on the model act," like a failed 1989 bill that "sought to incorporate much of the 1981 Model State Administrative Procedure Act, which was adopted by the Na-

tional Conference of Commissioners on Uniform State Laws, into North Dakota's Administrative Agencies Practice Act." Hoberg said the 1991 bill "integrates what it borrows from the model act into the existing framework of the Administrative [Agencies] Practices Act." Hoberg added:

In essence, it modernizes North Dakota's Administrative Agencies Practice Act, but leaves the basic framework, including most of the existing section numbers in place.

**4.** At oral argument, Shark summarized why he claimed he might be aggrieved:

I'm arguing that I'm aggrieved because, if the result of this under-capitalization, a lender takes over the telephone service, the payroll is not met, and the exchanges are not operating properly, and I try to get a customer, a witness, or another lawyer in one of those exchanges and I'm unable to do so, then my service is affected. That's the nuts and bolts of my position on being aggrieved.

one of the factors that the PSC should consider before approving transfer of these telephone exchanges. *See* 1995 N.D. Laws ch. 30, § 4. "Proposed rates" for the transferred exchanges will not affect Shark's rates for telephone service in his exchange not being transferred. The generalized interest that he describes is shared with every other telephone customer anywhere, and any potential effect on him is so remote and speculative that there is no reasonable basis for judicial review of his claims.

Like the school district in *Washburn,* Shark makes no plausible argument how he will either gain or lose anything from the transfer of telephone exchanges that do not furnish his telephone service. He has not shown the personal stake for the concrete adversary position necessary for an actual case or controversy. Shark is not factually aggrieved.

We affirm the dismissal of Shark's and Simons's appeals.

SANDSTROM, Acting C.J., LEVINE, S.J., NEUMANN, J., and DONOVAN J. FOUGHTY, District Judge, concur.

DONOVAN J. FOUGHTY, District Judge, sitting in place of VANDE WALLE, C.J., disqualified.