28 F.3d 1466
 BAKER ELECTRIC COOPERATIVE, INC., a North Dakota Rural
Electric Cooperative Association, Appellant,
v.
Joseph CHASKE, member of the Devils Lake Sioux Tribe Tribal
Utilities Commission; Myra Pearson, member of the Devils
Lake Sioux Tribe Tribal Utilities Commission; Oliver Gord,
Sr., member of the Devils Lake Sioux Tribe Tribal Utilities
Commission; Dr. Merrill Berg; Harold McGowan, President
and member of the Devils Lake Sioux Tribe Tribal Utilities
Commission, Appellees.
SHEYENNE VALLEY ELECTRIC COOPERATIVE, INC., Appellant,
v.
DEVILS LAKE SIOUX INDIAN TRIBE; Joseph Chaske; Myra
Pearson; Oliver Gord, Sr.; Dr. Merrill Berg;
Harold McGowan, President of the Devils
Lake Sioux Tribe Tribal
Utilities
Commission,
Appellees.
DEVILS LAKE SIOUX INDIAN TRIBE, a federally recognized
Indian tribe, Appellant,
v.
NORTH DAKOTA PUBLIC SERVICE COMMISSION; Leo M. Reinbold, as
member of the North Dakota Public Service Commission; Dale
V. Sandstrom, as member of the North Dakota Public Service
Commission; Bruce Hagen, as member of the North Dakota
Public Service Commission; State of North Dakota, Appellees.
Otter Tail Power Company, Amicus Curiae.
OTTER TAIL POWER COMPANY, a Minnesota corporation, Appellant,
v.
Bruce HAGEN, member of the North Dakota Public Service
Commission; Leo M. Reinbold, member of the North Dakota
Public Service Commission; Dale V. Sandstrom, member of the
North Dakota Public Service Commission, Appellees.
 Nos. 93-1696, 93-1699, 93-1995 and 93-1701.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1994.
Decided July 1, 1994.
 
 Larry M. Baer, Cando, ND, argued, for appellant.
 Mason Morisset, Seattle, WA, argued, for appellee.
 Before McMILLIAN, WOLLMAN, and MAGILL, Circuit Judges.
 MAGILL, Circuit Judge.
 
 
 1
 On appeal are four consolidated cases each relating to a dispute involving the rights to buy, sell, and regulate electric services on the Fort Totten Devils Lake Sioux Indian Reservation (Reservation). These appeals raise issues involving tribal sovereign immunity, the propriety of the district court's rescission of a temporary restraining order, and res judicata. We reverse and remand with instructions.
 
 I. BACKGROUND
 A. The Parties
 
 2
 The parties to the dispute are: the Devils Lake Sioux Indian Tribe (the Tribe) and members of the Devils Lake Sioux Tribe Tribal Utilities Commission (Tribal Utilities Commission); Otter Tail Power Company (Otter Tail); the North Dakota Public Service Commission (NDPSC) and its members; and two rural electric cooperative associations (collectively the RECs)--namely, Baker Electric Cooperative, Inc. (Baker Electric), and Sheyenne Valley Cooperative, Inc. (Sheyenne Valley).
 
 
 3
 The Tribe consists of members of the Devils Lake Sioux Band who occupy the Reservation. The Reservation, which was established pursuant to the Treaty with the Sioux-Sisseton and Wahpeton Bands, 15 Stat. 505 (1867), reprinted in C. Kappler, II Indian Affairs: Laws and Treaties 956 (2d ed. 1904) (1867 Treaty), comprises over 240,000 acres of land in northeast North Dakota. Land on the reservation is owned in four ways: (1) by the United States Government in trust for the Tribe (tribal trust land), (2) by the Tribe, (3) in fee by members of the Tribe, and (4) in fee by nonmembers of the Tribe. The Tribal Council, whose members are elected by the Tribe, governs Tribal affairs on the Reservation. The members of the Tribal Utilities Commission enforce the Tribal Utilities Code. The Tribe seeks to assert exclusive regulatory jurisdiction over electric services to its facilities on tribal trust land and throughout the Reservation in general.
 
 
 4
 Otter Tail is an investor-owned electric utility that operates in North Dakota. Otter Tail, or its predecessor in interest, has provided electricity to the Reservation for over sixty years. Otter Tail owns both transmission and distribution facilities on the Reservation. Otter Tail does not dispute that its operations outside of the Reservation in North Dakota are subject to regulation by NDPSC. See N.D.Cent.Code Sec. 49-02-01 (Supp.1993). Otter Tail presently provides electricity to Dakota Tribal Industries (DTI), a corporation chartered and owned by the Tribe and located on tribal trust land. Otter Tail seeks to provide electric services to the Reservation subject to the exclusive regulatory authority of the Tribe.
 
 
 5
 NDPSC is a state regulatory commission consisting of three constitutionally elected members, N.D. Const. art. V, Sec. 12, who are authorized under Title 49 of the North Dakota Century Code to regulate investor-owned electric utilities such as Otter Tail. NDPSC seeks to subject Otter Tail to its regulatory jurisdiction on the Reservation and to prevent the Tribe from limiting its regulatory authority on the Reservation.
 
 
 6
 Baker Electric and Sheyenne Valley are rural electric cooperative associations that provide electric services to various portions of North Dakota. See N.D.Cent.Code Secs. 10-13-01 to -05 (1985 & Supp.1993). Baker Electric and Sheyenne Valley serve both tribal and non-tribal members on the Reservation. The RECs seek to supply electric services to additional locations on the Reservation and to prevent the Tribe from subjecting them to the Tribe's regulatory authority on the Reservation.
 
 B. The Litigation
 
 7
 These appeals involve the interplay and possible overlap between the sovereign jurisdictions of the Tribe--acting through the members of the Tribal Utilities Commission--and the State of North Dakota--acting through the members of NDPSC--with respect to regulation of electric services on the Reservation. Both the Tribe and NDPSC seek to exercise exclusive regulatory authority over electric services on the Reservation. Otter Tail supports the Tribe and recognizes the Tribe as the exclusive regulatory authority on the Reservation. The RECs seek to prevent the Tribe from exercising regulatory authority on the Reservation. We turn to the specific facts underlying these appeals.
 
 
 8
 In September 1988, the Tribal Council selected Otter Tail to provide electricity for DTI. Otter Tail filed notice with NDPSC that it intended to extend electric services to DTI. NDPSC notified Otter Tail that it alone had jurisdiction and that Otter Tail should formally apply to NDPSC for a certificate of public convenience and necessity.
 
 
 9
 Baker Electric, which also sought to provide electricity to DTI, discovered that Otter Tail had begun to provide electric services to DTI before NDPSC had issued Otter Tail a certificate of public convenience and necessity. In November 1988, Baker Electric filed a protest with NDPSC and requested that NDPSC hold Otter Tail in contempt. In April 1989, NDPSC issued Otter Tail a show cause order and scheduled a hearing for later in that month. In response, Otter Tail petitioned the state district court for a writ of prohibition against any proposed action by NDPSC. The state district court granted the writ of prohibition. The North Dakota Supreme Court lifted the writ of prohibition and assumed supervisory jurisdiction over whether NDPSC had jurisdiction over electric services to DTI. See In re Application of Otter Tail Power Co., 451 N.W.2d 95, 97 (N.D.1990). In May 1989, after the North Dakota Supreme Court lifted the writ of prohibition, NDPSC determined that it had jurisdiction to regulate electric service to DTI.
 
 
 10
 The North Dakota Supreme Court then analyzed NDPSC's jurisdictional determination and, in January 1990, held that Otter Tail lacked standing to raise the rights of the Tribe. Id. at 98. After deciding jurisdictionally that Otter Tail lacked third-party standing to raise the Tribe's rights, the North Dakota Supreme Court nevertheless proceeded to decide on the merits that the Tribe had no sovereign right to regulate electricity use on the Reservation. Id. at 98-107. Justice Levine concurred in the majority's result based on Otter Tail's lack of standing to raise the rights of the Tribe, id. at 107-08, and noted that the majority had "ranged far and wide in answering broad questions about the authority of the Tribe" that were not before the court, id. at 108.
 
 
 11
 Thereafter, in July 1990, the Tribal Council enacted the Tribal Utilities Code, which asserts extensive regulatory authority over electric services within the historic exterior boundaries of the Reservation. In response to the Tribal Council's enactment of the Tribal Utilities Code, Baker Electric and Sheyenne Valley brought suit against the members of the Tribal Utilities Commission. Nos. 93-1696, 93-1699 Baker Electric Coop. v. Joseph Chaske (Suits 1 & 2, Nos. 93-1696, 93-1699, Baker Electric v. Chaske ). The RECs argue that the Tribe lacks regulatory jurisdiction over electric utilities doing business within the exterior boundaries of the Reservation. The RECs sought prospective injunctive relief against the individual members of the Tribal Utilities Commission to prevent them from exercising the authority invested in them by the Tribal Utilities Code. The district court dismissed the RECs' suits because the sovereign Tribe had not consented to the suits, and therefore the district court lacked jurisdiction.
 
 
 12
 In August 1990, NDPSC ordered Otter Tail to discontinue service to DTI. The Tribe filed suit against NDPSC and its individual members alleging that the Tribe had the right to purchase electricity from the supplier of its choice. No. 93-1995 Devils Lake Sioux Indian Tribe v. North Dakota Pub. Serv. Comm'n (Suit 3, No. 93-1995, Tribe v. NDPSC ). The Tribe requested and, on September 4, 1990, was granted injunctive relief that prevented NDPSC from interfering with its choice of suppliers. See Tribe's App. No. 93-1995, at 23-24 (Sept. 4, 1990 order). The district court later rescinded the September 4, 1990 temporary restraining order (TRO) that prohibited NDPSC from interfering with the Tribe's regulation of electric services on the Reservation.
 
 
 13
 Meanwhile, Otter Tail also brought suit against the members of NDPSC with respect to Otter Tail's intention to provide electric services to the Tribe's new Headstart facility which, like DTI, is a tribal facility located on tribal trust land. No. 93-1701 Otter Tail Power Co. v. Bruce Hagen (Suit 4, No. 93-1701, Otter Tail v. Hagen ). Otter Tail sought to prevent NDPSC from interfering with its relationship with the Tribe based on the Supremacy Clause of the Constitution. Specifically, Otter Tail alleged that the Tribe's sovereign rights prohibit NDPSC from interfering with the Tribe's choice of electricity suppliers. The district court dismissed Otter Tail's suit because it was barred by res judicata.
 
 II. DISCUSSION
 
 14
 Although arising from the same factual core, the consolidated appeals resulting from the district court's February 3, 1993 order raise three separate issues.[1] In Suits 1 & 2, Nos. 93-1696, 93-1699, Baker Electric v. Chaske, the RECs appeal the dismissal of their cases based on the Tribe's sovereign immunity. In Suit 3, No. 93-1995, Tribe v. NDPSC, the Tribe seeks review of the district court's rescission of the TRO that had enjoined NDPSC from interfering with the Tribe's relations with Otter Tail. Finally, in Suit 4, No. 93-1701, Otter Tail v. Hagen, Otter Tail appeals the district court's dismissal of its case based on res judicata. We examine these cases in turn.A. Suits 1 & 2, Nos. 93-1696, 93-1699, Baker Electric v.
 
 Chaske
 
 15
 The RECs appeal the district court's dismissal of their suits against the members of the Tribal Utilities Commission.[2] The RECs argue that the tribal officers are not protected by the Tribe's sovereign immunity when they act pursuant to an unconstitutional tribal statute. The Tribe argues that an officer suit is not appropriate because the Tribe had authority to promulgate its Tribal Utilities Code and because the tribal officers have not acted.[3] Because the district court's analysis in support of its dismissal is inconsistent with our precedent, we reverse and remand to the district court.
 
 
 16
 Whether a suit is barred by a Tribe's sovereign immunity is an issue of law that we determine de novo. See Burlington N. R.R. v. Blackfeet Tribe, 924 F.2d 899, 901 (9th Cir.1991). "Indian tribes and their governing bodies possess common-law immunity from suit. They may not be sued absent express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress." Id.; accord Tenneco Oil Co. v. Sac & Fox Tribe of Indians, 725 F.2d 572, 574 (10th Cir.1984). The Tribe's sovereign immunity, however, is subject to the well-established exception described in Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 514, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991); Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community, 991 F.2d 458, 460 (8th Cir.1993). In Ex parte Young, the Supreme Court held that "a suit challenging the constitutionality of a state official's action is not one against the State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (analyzing Ex parte Young ); see also Nix v. Norman, 879 F.2d 429, 432 (8th Cir.1989). Thus, when a complaint alleges that
 
 
 17
 "the named officer defendants have acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked.... If the sovereign did not have the power to make a law, then the official by necessity acted outside the scope of his authority in enforcing it, making him liable to suit."
 
 
 18
 Northern States Power, 991 F.2d at 460 (quoting Tenneco Oil, 725 F.2d at 574 (citations omitted)). Therefore, "[i]f the tribe did not have the power to enact this ordinance, then the tribal officers were not clothed with the tribe's sovereign immunity." Id.
 
 
 19
 Applying Northern States Power, the dispositive issue before this court is whether the Tribe had the authority to enact the Tribal Utilities Code: If yes, the tribal officers are clothed with the Tribe's sovereign immunity; if no, then the sovereign immunity defense must fail. See id. We decline, however, to decide in the first instance whether the Tribe had this authority. See Tenneco, 725 F.2d at 576 (remanding case back to district court to give Tribe an opportunity to prove that it had authority to enact an ordinance). Further, we reject the Tribe's contention that officer suits are inappropriate where the officers have not acted. Tribe's Br. Nos. 93-1696, 93-1699, at 3-5. The RECs seek to enjoin the members of the Tribal Utilities Commission from enforcing the Tribal Utilities Code, and therefore their suits are squarely of the type recognized and approved of by this court in Northern States Power. See 991 F.2d at 460 (approving of suit that sought to enjoin tribal officers from enforcing tribal ordinance); see also South Dakota v. Bourland, 949 F.2d 984, 989 (8th Cir.1991) (upholding propriety of suit seeking injunctive relief against tribal officers), rev'd on other grounds, --- U.S. ----, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993).
 
 
 20
 Therefore, we reverse the dismissal of the RECs' suits, and we remand to the district court to evaluate the Tribe's sovereign immunity under the analysis set out in Northern States Power.
 
 B. Suit 3, No. 93-1995, Tribe v. NDPSC
 
 21
 The Tribe appeals the district court's rescission of the TRO that enjoined NDPSC from interfering with the Tribe's relations with Otter Tail. Although labeled a temporary restraining order, the district court's TRO was in effect for thirty months. In addition, proper notice and a hearing preceded the district court's clarification of the TRO in July 1992. The parties do not dispute that although labeled a TRO, the district court's order constituted a preliminary injunction.[4] Therefore, this court has jurisdiction, pursuant to 28 U.S.C. Sec. 1292(a)(1) (1988), to review the district court's rescission of the preliminary injunction. See Nordin v. Nutri/System, Inc., 897 F.2d 339, 343 (8th Cir.1990) (temporary restraining order that exceeded ten days and had no expiration date "must be treated as a preliminary injunction and therefore is appealable"); see also Wright & Miller, Federal Practice and Procedure: Civil Sec. 2962, at 619-20 & nn. 1-2 (1982).
 
 
 22
 The burden of establishing the propriety of a preliminary injunction is on the movant. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir.1989) (en banc). Whether a preliminary injunction should issue "involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981) (en banc). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Calvin Klein Cosmetics Corp. v. Lenox Lab., 815 F.2d 500, 503 (8th Cir.1987); Dataphase, 640 F.2d at 114. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm. Modern Computer Sys., 871 F.2d at 738; Dataphase, 640 F.2d at 114.
 
 
 23
 We review a district court's decision to grant or rescind a preliminary injunction for an abuse of discretion. Id. at 114 n. 8.
 
 
 24
 An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.
 
 
 25
 United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir.1987). Our review is made substantially more difficult because there is no indication in its opinion that the district court applied the Dataphase factors when it granted the preliminary injunction or when it later rescinded the preliminary injunction. Thus, we must analyze the four Dataphase factors without the benefit of the district court's insight.
 
 1. Irreparable Harm
 
 26
 The Tribe argues that without the preliminary injunction, it suffers a threat of irreparable harm because NDPSC will interfere with the Tribe's right to self government and will disrupt electric services to DTI, a vital tribal enterprise. We reject the first argument, but we accept the second.
 
 
 27
 The threat of irreparable harm to the Tribe's right to self government assumes that NDPSC has no authority to regulate Otter Tail on the Reservation. This issue remains before the district court, and we decline to resolve it in the first instance. The Tribe, however, has demonstrated a threat of irreparable harm in that rescission of the preliminary injunction threatens to disrupt electric services to the DTI facility. Presently, Otter Tail provides power to DTI. If the preliminary injunction is not reinstated, NDPSC could disrupt electric services to DTI by forcing Otter Tail to cease providing power to that tribal facility. This threatened disruption of electric services could hinder the productivity of DTI and result in economic harm to the Tribe. Further, the Tribe would be unable to recover any damages resulting from this disruption as NDPSC has Eleventh Amendment sovereign immunity in federal court in suits requesting money damages. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03, 104 S.Ct. 900, 909-10, 79 L.Ed.2d 67 (1984) ("[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may ... not ... award[ ] retroactive monetary relief."); see also Leadbetter v. Rose, 467 N.W.2d 431, 432 (N.D.1991) ("When an action is essentially against the state to recover money, the state is the real party in interest and is entitled to invoke sovereign immunity...."). Even if the Tribe prevails on the merits, it nevertheless will lack an adequate remedy at law against NDPSC. Cf. Modern Computer Sys., 871 F.2d at 738 (rejecting claim of irreparable harm because party had adequate remedy at law if it prevailed on the merits). The Tribe has demonstrated a threat of irreparable harm if the preliminary injunction is not reinstated.[5]
 
 
 28
 2. Balance Between Irreparable Harm to Tribe and Injury to NDPSC
 
 
 29
 The balance between the threat of irreparable harm to the Tribe and injury to NDPSC if the preliminary injunction is reinstated weighs in favor of the Tribe. Both the Tribe and NDPSC argue that their respective sovereign authorities are threatened. NDPSC, however, stated at oral argument that so long as this court did not decide the merits of the case, it would suffer no harm if the preliminary injunction were reinstated. Tape of Oral Arg., No. 93-1995.[6] Since the district court's rescission of the preliminary injunction on February 3, 1993, NDPSC has chosen not to exercise its claimed authority over Otter Tail. Id. Further, unlike the Tribe, NDPSC is not threatened with any potential economic harm if this court reinstates the preliminary injunction. The balance of the irreparable harm to the Tribe and injury to NDPSC weighs in favor of reinstatement of the preliminary injunction.
 
 3. Likelihood of Success on the Merits
 
 30
 The Tribe argues that because the district court already has granted partial summary judgment in its favor on the Tribe's sovereign right to regulate electric services to tribal industries on tribal land and on tribal trust land, its likelihood of success on the merits is certain. NDPSC, however, interprets the district court's statements as indicating that NDPSC will prevail on the merits. We examine the district court's opinion.
 
 
 31
 In its opinion of February 3, 1993, which granted partial summary judgment to the Tribe, the district court held:
 
 
 32
 [T]he sovereignty of the Devils Lake Sioux Tribe requires that the Tribe may contract for the provision of electrical and other regulated services to tribal operated industries or facilities located upon tribal owned or trust lands, without regard to the regulations of the North Dakota Public Service Commission in attempted enforcement of the so called Territorial Integrity Act.
 
 
 33
 Dist.Ct.Op. at 7 (Feb. 3, 1993) (emphasis added). The district court also stated:Obviously, the regulation of electrical service within the reservation is a meaningless gesture if the electrical service cannot get to the reservation, and while the court is willing to acknowledge tribal sovereignty, it is not willing to try to curtail the exercise of state sovereignty which may well frustrate the tribal government. ... The Court is hopeful that good will and common sense will prevail, and in their absence believes the solution is one for Congress rather than this Court.
 
 
 34
 Id. at 6-8 (emphasis added). Upon a motion by NDPSC, the district court later clarified its opinion by stating
 
 
 35
 [t]he court's previous decision, while granting partial summary judgment to the [Tribe], may have been an illusory victory. The court does not have jurisdiction over [NDPSC] and does not pretend [to] know how the tribal government can guarantee electrical service to its tribally owned property within the reservation.... The court made no decision as to the power of [NDPSC].
 
 
 36
 Dist.Ct.Op. at 2 (Mar. 15, 1993) (emphasis added). Thus, the parties' contradictory conclusions both find support in the district court's opinion. We decline to resolve the ambiguity in the district court's statements because to do so could resolve indirectly what we lack jurisdiction to resolve directly. See supra note 1. Because both parties rely upon the district court's opinion to support their arguments that they are likely to prevail on the merits, we conclude that neither the Tribe nor NDPSC has demonstrated a likelihood of success on the merits.
 
 4. Public Interest
 
 37
 The final Dataphase factor is the public interest. The Tribe argues that rescission of the preliminary injunction is against the public interest because it results in uncertainty and will force the Tribe to pay a premium for electric services. On balance, we conclude that the public interest weighs in favor of reinstatement of the preliminary injunction.
 
 
 38
 First, we must reject the Tribe's uncertainty argument. Regardless of the resolution of the preliminary injunction issue, uncertainty will exist until the district court decides this dispute on the merits. We conclude, however, that the public interest favors reinstatement of the preliminary injunction during the pendency of the litigation. Presently, Otter Tail provides electricity to DTI. Before Baker Electric could provide service to DTI, it would need to construct 250 feet of underground lines. The public ultimately would bear the cost of this construction. If this court does not reinstate the temporary restraining order and the Tribe ultimately prevails on the merits, the additional construction costs borne by the public would constitute a wasted investment. Conversely, if we reinstate the temporary restraining order and NDPSC ultimately prevails on the merits, the public will have suffered no additional cost because Otter Tail already has expended the resources necessary to build lines to DTI. Thus, the public's interest in minimizing unnecessary cost weighs in favor of reinstatement of the preliminary injunction. Cf. James River Flood Control Ass'n v. Watt, 680 F.2d 543, 544-45 (8th Cir.1982) (per curiam) (public interest served by avoiding "greater expenditures from the public treasury").
 
 5. Conclusion
 
 39
 We hold that the Tribe has carried its burden of demonstrating that the district court abused its discretion when it rescinded the preliminary injunction. The Tribe has demonstrated that: it faces a threat of irreparable harm; the potential harm to NDPSC, in light of its concession at oral argument, is outweighed by the threat of irreparable harm to the Tribe; and the public interest weighs in favor of reinstatement. Therefore, we reverse and remand to the district court with instructions to reinstate the preliminary injunction during the pendency of the litigation.
 
 C. Suit 4, No. 93-1701, Otter Tail v. Hagen
 
 40
 Otter Tail appeals the district court's dismissal of its suit against the members of NDPSC based on res judicata. To support this determination, the district court relied upon the North Dakota Supreme Court's decision in In re Application of Otter Tail Power Co., 451 N.W.2d 95 (N.D.1990). Unsure of the basis for the district court's decision, the parties have briefed and argued both res judicata and collateral estoppel.[7]
 
 
 41
 Res judicata and collateral estoppel are issues of substantive law requiring the application of the law of the forum state. Kuehn v. Garcia, 608 F.2d 1143, 1147 (8th Cir.1979), cert. denied, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980). This court must give preclusive effect to state court judgments whenever the courts of the state court would do so. Newman Signs, Inc. v. Sinner, 796 F.2d 247, 249 (8th Cir.1986). Under North Dakota law, the applicability of res judicata or collateral estoppel is a question of law. Hofsommer v. Hofsommer Excavating, Inc., 488 N.W.2d 380, 383 (N.D.1992).
 
 
 42
 "Res judicata is a term often used to describe such doctrines as merger, bar, and collateral estoppel." Id. (internal quotation marks omitted). "Res judicata, or claim preclusion, is the more sweeping doctrine that prohibits the relitigation of claims ... that were raised or could have been raised in a prior action between the same parties or their privies and which w[ere] resolved by final judgment in a court of competent jurisdiction." Id.
 
 
 43
 "[C]ollateral estoppel, or issue preclusion, generally forecloses the relitigation ... of particular issues of either fact or law which were ... litigated and determined in the prior suit." Id. Under North Dakota law, a litigant must satisfy four tests before collateral estoppel will bar relitigation of a fact or issue from an earlier lawsuit:
 
 
 44
 (1) Was the issue decided in the prior adjudication identical to the one presented in the action in question?; (2) Was there a final judgment on the merits?; (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?; and (4) Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?
 
 
 45
 Id. at 384. In addition, North Dakota has adopted comment i to the Restatement (Second) of Judgments Sec. 27. See Vanover v. Kansas City Life Ins. Co., 438 N.W.2d 524, 526 (N.D.1989). Comment i to Sec. 27 states: "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments Sec. 27, cmt. i (1982). Thus, the courts of North Dakota would not give preclusive effect to either of two determinations by a court of first instance when each determination independently supports the court's judgment. See Vanover, 438 N.W.2d at 526. We now turn to apply these doctrines.
 
 
 46
 First, we hold that the doctrine of res judicata, or claim preclusion, does not bar Otter Tail's suit against the members of NDPSC because the present case involves a claim that was not, and could not have been, raised in the prior litigation. Application of Otter Tail involved a determination of whether NDPSC "ha[d] regulatory authority over electric utilities competing for a service point within an Indian reservation." 451 N.W.2d at 96 (emphasis added). The North Dakota Supreme Court limited its supervisory review to whether NDPSC "had jurisdiction to regulate electric service to the DTI building on the reservation." Id. at 97.
 
 
 47
 In contrast, Suit 4, No. 93-1701, Otter Tail v. Hagan, involves Otter Tail's attempt to prevent the members of NDPSC from interfering with its provision of electric services to the Tribe's Headstart facility. The Tribe authorized Otter Tail to provide electric services to the Headstart facility in October 1991, Otter Tail's App. No. 93-1701, at 31, well over a year after the North Dakota Supreme Court issued its opinion in Application of Otter Tail. See 451 N.W.2d at 95 (opinion filed Jan. 25, 1990). Otter Tail's claim arises from a separate cause of action that Otter Tail could not have raised in the prior litigation. See Hofsommer, 488 N.W.2d at 383. We hold that claim preclusion does not bar Otter Tail's claim.
 
 
 48
 Second, we conclude that the doctrine of collateral estoppel does not preclude Otter Tail's suit. In Application of Otter Tail, the North Dakota Supreme Court decided that NDPSC had regulatory authority over electric utilities competing for a service point within the Reservation. 451 N.W.2d at 96. The North Dakota Supreme Court supported this holding on two distinct bases: (1) Otter Tail lacked standing to raise the rights of the Tribe, id. at 98, and (2) assuming that Otter Tail had standing to assert the self-government rights of the Tribe, the Tribe had no right to regulate electric utilities on the Reservation, id. at 101-07.
 
 
 49
 Either of the two bases relied upon by the North Dakota Supreme Court standing alone was sufficient to support the result in that case. See id. at 107-08 (Levine, J., concurring in result based solely on third-party standing determination). Further, through application of its supervisory powers, the North Dakota Supreme Court asserted original jurisdiction and thus was the "court of first instance" in that case. See id. at 97; see also Vanover, 438 N.W.2d at 526 (holding that neither of two alternative bases by a court of first instance could be used to preclude relitigation of either issue).[8] We conclude that collateral estoppel does not preclude Otter Tail's claim in this case. See id.
 
 
 50
 NDPSC also raises numerous other arguments for affirmance upon which the district court has not yet ruled. The district court should analyze these arguments in the first instance. Therefore, we reverse the district court's dismissal of Otter Tail's suit based on res judicata.
 
 III. DIRECTIONS ON REMAND
 
 51
 We remand with instructions that the district court make detailed factual determinations and set out its analysis in support of its legal determinations. On remand, the district court should consider the factors set out in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and its progeny, to settle the core issue in this dispute: whether the Tribe has the sovereign authority to regulate electric services on the Reservation, and whether the Tribe's authority preempts that of NDPSC. The district court should determine: first, whether Congress has granted the Tribe the authority to regulate electric services through the 1867 Treaty or through subsequent congressional legislation; second, if Congress has granted the Tribe regulatory authority over electric services, whether Congress later has abrogated that regulatory authority; third, if Congress has abrogated the Tribe's express regulatory authority over electric services, whether the Tribe retains inherent authority to regulate electric services on the Reservation; fourth, and finally, if the Tribe retains regulatory authority over electric services, whether that authority preempts NDPSC's authority.[9]
 
 A. Express Authority of the Tribe
 
 52
 To determine whether the Tribe has express authority to regulate electric services utilities on the Reservation, the district court should first look to the Tribe's 1867 Treaty with the United States, which states:
 
 
 53
 The chiefs and head-men located upon either of the reservations set apart for said bands are authorized to adopt such rules, regulations, or laws for the security of life and property, the advancement of civilization, and the agricultural prosperity of the members of said bands ... shall have authority, under the direction of the agent, and without expense to the Government, to organize a force sufficient to carry out all such rules, regulations, or laws.
 
 
 54
 Tribe's App. No. 93-1995, at 58. The 1867 Treaty also states that the Tribe "hereby cede[s] to the United States the right to construct wagon-roads, railroads, mail stations, telegraph lines, and such other public improvements as the interest of the Government may require." Id. at 56. The district court should determine whether the 1867 Treaty authorizes the Tribe to regulate electric services on the Reservation. The district court also should consider whether subsequent congressional acts grant the Tribe authority to regulate electric services on the Reservation. See, e.g., 28 U.S.C. Sec. 1360(b) (1988); 25 C.F.R. Sec. 1.4(a) (1993).
 
 
 55
 B. Congress's Abrogation of the Tribe's Rights
 
 
 56
 If the district court determines that the 1867 Treaty or subsequent congressional acts have invested the Tribe with the authority to regulate electric services on the Reservation, the district court should then determine whether later congressional action has abrogated that authority. The district court should keep in mind that Congress can abrogate the Tribe's treaty rights, but must do so explicitly. See South Dakota v. Bourland, --- U.S. ----, ---- - ----, 113 S.Ct. 2309, 2315-16, 124 L.Ed.2d 606 (1993); cf. Montana v. United States, 450 U.S. 544, 560-61, 101 S.Ct. 1245, 1256, 67 L.Ed.2d 493 (1981) (examining effect of subsequent alienation of land on "exclusive use" language of prior treaty).
 
 C. Tribe's Inherent Sovereignty
 
 57
 If the district court determines that the Tribe does not have express authority to regulate electric services on the Reservation, the district court should then determine whether the Tribe retains inherent authority to do so. "Indian tribes possess the 'inherent powers of a limited sovereignty which has never been extinguished.' " EEOC v. Fond du Lac Heavy Equip. & Constr. Co., 986 F.2d 246, 248 (8th Cir.1993) (quoting United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085-86, 55 L.Ed.2d 303 (1978)). "[T]he 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.' " Bourland, --- U.S. at ----, 113 S.Ct. at 2319 (quoting Montana, 450 U.S. at 564, 101 S.Ct. at 1257).
 
 
 58
 The district court should determine whether regulation of electric services is necessary to protect the Tribe's self-government rights or to control the internal relations within the Tribe. Generally, inherent tribal authority does not extend to the activities of nonmembers of the Tribe on fee land, id., but inherent tribal authority generally does extend to civil jurisdiction over activities by nonmembers of the Tribe on tribal land or on land held by the United States in trust for the Tribe. See Montana, 450 U.S. at 557, 565, 101 S.Ct. at 1254, 1258. Further, the district court should distinguish its inherent-authority determinations with reference to the character of the land at issue, i.e., tribal trust land, tribal land, or fee land.
 
 
 59
 The district court also should address the limitation on the regulatory power of the Tribe over nonmembers. That general limitation has two exceptions. First, "a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." Id. at 565, 101 S.Ct. at 1258. The district court should determine whether providing electricity to the Reservation involves a consensual relationship. Second, "a tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566, 101 S.Ct. at 1258 (emphasis added). The district court should determine whether provision of electric services to DTI, the Tribe's Headstart facility, or other locations on the Reservation has a direct effect on the political integrity, economic security, or the health and welfare of the Tribe.
 
 D. Preemption of State Law
 
 60
 Finally, if it determines that the Tribe has the authority to regulate electric services on the Reservation, the district court should analyze whether the Tribe's authority preempts the authority of NDPSC. The district court should keep in mind that " 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,' " California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987) (quoting Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980)). "[S]tate laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." Id. Further, state jurisdiction is preempted " 'if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.' " Id. 480 U.S. at 216, 107 S.Ct. at 1092 (quoting New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983)). The district court should conduct this inquiry "in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." Id.
 
 IV. CONCLUSION
 
 61
 For these reasons we reverse the district court's judgment, and we remand to the district court with instructions.
 
 
 
 [1]
 Devils Lake Sioux Indian Tribe v. North Dakota Pub. Serv. Comm'n, No. 90-179, slip op. at 7 (D.N.D. Feb. 3, 1993) (hereinafter, "Dist. Ct. Op. at --- (Feb. 3, 1993)"). The district court also granted partial summary judgment to the Tribe. That decision is not on appeal before us
 
 
 [2]
 The district court stated that "the Tribe has not consented to suit against it in this court by Baker and Sheyenne Valley cooperatives, and therefore [those cases] are hereby DISMISSED ... as this court has no jurisdiction over the tribal entity without its consent." Dist.Ct.Op. at 7 (Feb. 3, 1993). The district court gave no further reasoning in support of its decision
 
 
 [3]
 An officer suit constitutes a limited exception to the doctrine of sovereign immunity whereby plaintiffs may vindicate rights infringed by the sovereign. Nix v. Norman, 879 F.2d 429, 432 (8th Cir.1989) (describing officer suits against state officials). If an officer acts pursuant to a sovereign enactment that violates federal law, the officer acts without the sovereign's authority and therefore is subject to suit for prospective injunctive relief. Id. at 432
 
 
 [4]
 Hereinafter, we will refer to the district court's September 4, 1990 TRO as "the preliminary injunction."
 
 
 [5]
 We note that the Tribe also faces a threat of irreparable harm because Otter Tail apparently provides less expensive electric services than Baker Electric. See NDPSC's App. No. 93-1995, at 559 (discussing differences in electric services prices). If the Tribe is forced to purchase the more expensive services during the pendency of the litigation, the increased cost threatens the revenues of the Tribe
 
 
 [6]
 "[NDPSC]: [Reinstatement of the preliminary injunction] doesn't harm [NDPSC] so long as it is very carefully drawn so that ... the tribe will [not] be able to argue that it is somehow the final or advisory ruling from this court on the jurisdictional issue." Id. "[COURT]: [W]hy shouldn't we retain the preliminary injunction until the final and ultimate resolution in this issue? [NDPSC]: So long as that decision does not indirectly or directly deal with the regulatory issue, with the jurisdictional issue, I don't have a great problem with that." Id
 
 
 [7]
 The district court held that "the action by Otter Tail is barred by the doctrine of res judicata, the judgment of the North Dakota Supreme having become a final judgment." Dist.Ct.Op. at 7 (Feb. 3, 1993). Earlier in its opinion, the district court stated that "Otter Tail did not seek certiorari for review of the decision of the North Dakota Supreme Court which determined that Otter Tail was not excused from the jurisdiction of the [NDPSC] by virtue of the Tribal Council Resolution. That judgment is final, whether Justice Meschke's analysis is dicta or not." Id. at 6. The district court provided no further analysis in support of its decision
 
 
 [8]
 Although administrative agencies are not courts, some of their decisions may have preclusive effect. Westman v. Dessellier, 459 N.W.2d 545, 547 (N.D.1990). North Dakota courts, however, are more cautious to give preclusive effect to administrative determinations. United Hosp. v. D'Annunzio, 466 N.W.2d 595, 599 (N.D.1991). NDPSC was one of the parties appearing before the North Dakota Supreme Court in Application of Otter Tail, 451 N.W.2d at 95. Cf. id. (declining to give preclusive effect to county commission determination where commission acted as agent for county and decided for its principal). Thus, we conclude that the North Dakota Supreme Court was the court of first instance
 
 
 [9]
 In its Clarifying Order, the district court stated that "[t]he court does not have jurisdiction over [NDPSC]." Dist.Ct.Op. at 2 (Mar. 15, 1993). That statement is incorrect because the court has jurisdiction over NDPSC through the suits against NDPSC's members. See Ex parte Young, 209 U.S. at 159-60, 28 S.Ct. at 454